UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO.: 3:25-cr-13-MOC |
| | ) | |
| v. | ) | **BILL OF INFORMATION** |
| | ) | |
| TAMARA VEAL | ) | 18 U.S.C. § 371 |
| | ) | |

THE UNITED STATES ATTORNEY CHARGES:

At the specified times and at all relevant times:

### Introductory Allegations

1. From no later than August 2020 through at least August 2021, TAMARA VEAL conspired with co-conspirators to commit wire fraud through a scheme to fraudulently obtain more than $300,000 in COVID-19 relief funds, including federal disaster loans.

### Defendant and Related Individuals and Entities

2. VEAL was a resident of Charlotte, North Carolina, who was employed by 1st and Goal, a restaurant and sports bar located in Charlotte, North Carolina, during the time frame in which the alleged conspiracy occurred.

3. The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

### The Economic Injury Disaster Loan Program

4. An Economic Injury Disaster Loan ("EIDL") was an SBA-administered loan designed to help small businesses that suffered substantial economic injury as a result of a declared disaster. An EIDL helped businesses meet necessary financial obligations that could have been met had the disaster not occurred. It provided relief from economic injury that the disaster caused and permitted businesses to maintain a reasonable working capital position during the period that the disaster affected.

5. In or around March 2020, the Coronavirus Aid, Relief, and Economic Security

1

("CARES") Act was enacted to provide emergency financial assistance to millions of Americans suffering negative economic effects caused by the COVID-19 pandemic. The CARES Act established several new programs and provided for the expansion of others, including programs created and/or administered by the SBA.

6. The CARES Act authorized the SBA to provide EIDLs to eligible small businesses experiencing substantial financial disruptions due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses. The amount of the advance was determined by the number of employees the applicant certified having. The advances did not have to be repaid.

7. In order to obtain an EIDL and advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenue for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period was that preceding January 31, 2020. The applicant also was required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

8. EIDL applications were submitted directly to the SBA, and any funds issued under an EIDL or advance were issued directly by the SBA. The amount of the loan, if the application was approved, was determined based, in part, on the information provided in the application concerning the number of employees, gross revenue, and costs of goods, as described above. EIDL funds were permitted to be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

### The Paycheck Protection Program

9. The Paycheck Protection Program ("PPP") was a COVID-19 pandemic relief program administered by the SBA that provided forgivable loans to small businesses for job retention and certain other expenses. The PPP permitted participating SBA approved lenders to approve and disburse SBA-backed PPP loans to cover payroll, fixed debts, utilities, rent/mortgage, accounts payable and other bills incurred by qualifying businesses during, and resulting from, the COVID-19 pandemic. PPP loans were fully guaranteed by the SBA.

10. To obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan, including that the business was in operation and either had employees for whom it paid salaries and payroll taxes or paid independent contractors. A business applying for a PPP loan was required to provide documentation showing its payroll expenses, such as filed federal income tax documents. The business must have existed in an operational condition on or before February 15, 2020.

2

11.     The proceeds of a PPP loan could be used for certain specified items, such as payroll costs, costs related to the continuation of group health care benefits, or mortgage interest payments. The proceeds of a PPP loan were not permitted to be used by the borrowers to purchase consumer goods, automobiles, personal residences, clothing, jewelry, to pay the borrower's personal federal income taxes, or to fund the borrower's ordinary day-to-day living expenses unrelated to the specified authorized expenses.

### The Restaurant Revitalization Fund

12.     The Restaurant Revitalization Fund ("RRF") was a program implemented during the American Rescue Plan to provide emergency assistance for eligible restaurants, bars, and other qualifying businesses impacted by COVID-19. This relief fund was a program designed to help keep restaurants open during the pandemic. Recipients of RRF funds were not required to repay the funding as long as the funds were utilized for eligible uses by the expiration date.

13.     All awardees were required to report to the SBA by December 31, 2021, and inform the SBA how much of the award had been used for eligible use categories. If all funds awarded were not spent by December 31, 2021, awardees were required to submit annual reports until all funds were spent on eligible use categories. All awarded funds were required to be exhausted by March 11, 2023.

14.     Allowable uses of the funds included expenses such as business payroll costs (including sick leave); payments on any business mortgage obligation; business rent payments (this does not include prepayment of rent); business debt service, both principal and interest; business utility payments; business maintenance expenses; construction of outdoor seating; business supplies (including protective equipment and cleaning materials); business food and beverage expenses (including raw materials); covered supplier costs; and business operating expenses.

### COUNT ONE

**18 U.S.C. § 371**
**(Conspiracy to Commit Wire Fraud)**

15.     The United States Attorney realleges and incorporates by reference herein all of the allegations contained in paragraphs one through eleven of this Bill of Information, and further alleges that:

16.     From no later than August 2020 through at least August 2021, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant

**TAMARA VEAL,**

and others known and unknown to the United States Attorney, did knowingly combine, conspire, confederat and agree to commit offenses against the United States, including wire fraud in

3

violation of Title 18, United States Code Section 1343.

## Object of the Conspiracy

17. *Wire Fraud:* It was a part and an object of the conspiracy that VEAL, and others known and unknown to the United States Attorney, having devised the scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts described below, would and did transmit and cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purposes of executing said schemes and artifices, in violation of Title 18, United States Code Section 1343.

## Purpose

18. The purpose of the conspiracy was to fraudulently obtain more than $300,000 in COVID-19 relief funds, including federal disaster loans.

## Manner and Means

19. VEAL, and others known and unknown to the United States Attorney, carried out the conspiracy through the following manner and means, among others:

   a. VEAL submitted fraudulent and false applications for EIDL, PPP, and RRF funds on behalf of 1st and Goal. The falsities centered on, among other things, the number of employees, overall payroll expenses, and representations that the funds sought would be used for legitimate business expenses.

   b. VEAL caused the proceeds from the EIDL, PPP, and RRF applications to be deposited into various bank accounts under her dominion and control.

   c. Thereafter, VEAL used the fraudulently obtained EIDL, PPP, and RRF funds to conduct numerous financial transactions including transfer of money to co-conspirators and expenditure of funds for her own personal expenses.

## Overt Acts

20. In furtherance of the conspiracy and to affect the object thereof, VEAL and others known and unknown to the United States Attorney committed at least one of the following overt acts, among others:

   a. On or about August 5, 2020, VEAL submitted a fraudulent application for PPP funds for employee payroll at 1st and Goal. The application contained false representations, including a fraudulent list of employees who worked at the restaurant.

   b. On August 11, 2020, a deposit of $38,602.00 from a PPP payment was made

4

into VEAL's personal Bank of America checking account. The withdrawals and payments made from of this account following the deposit were for personal expenses.

    c.  On or about August 8, 2020, VEAL submitted a fraudulent application for EIDL funds on behalf of 1st and Goal. The application contained false representations, including that any funding received would be used for legitimate business expenses.

    d.  On August 11, 2020, a deposit of $114,900.00 was made into a Truliant Federal Credit Union account ("Truliant Account") to provide economic relief for 1st and Goal.

    e.  On August 12, 2020, withdrawals were made from the Truliant account in the amounts of $47,450.00 and $67,450.00. A 1st and Goal check for $47,450.00 was deposited in VEAL's personal Bank of America savings account.

    f.  On or about February 11, 2021, VEAL submitted a fraudulent application for PPP funds for employee payroll at 1st and Goal. The application contained false representations, including a fraudulent list of employees who worked at the restaurant.

    g.  On February 17, 2021, a second PPP loan in the amount of $42,723.00 was deposited into VEAL's personal Bank of America checking account. The withdrawals and payments made from of this account following the deposit were for personal expenses.

    h.  On or about May 3, 2021, VEAL submitted a fraudulent application for RRF funds on behalf of 1st and Goal. The application contained false representations, including that any funding received would be used for legitimate business expenses.

    i.  On May 11, 2021, the Truliant account received a deposit of RRF funds in the amount of $116,585.00. That same day, three withdrawals were made from the account totaling $114,000.00, including a $30,000.00 check issued to VEAL, which was deposited into her personal Bank of America checking account.

    j.  On March 30, 2020, VEAL submitted a fraudulent application for EIDL funds on behalf of 1st and Goal. The application contained false representations, including that any funding received would be used for legitimate business expenses. The application was initially declined, requesting additional documentation. After being resubmitted multiple times, it was finally approved in August 2021.

    k.  On August 26, 2021, an EIDL payment in the amount of $10,000.00 was deposited into VEAL's personal Bank of America checking account. The withdrawals and payments made from of this account following the deposit were for personal expenses.

All in violation of Title 18, United States Code Section 371.

## NOTICE OF FORFEITURE

Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

    a.    All property which constitutes or is derived from proceeds of the violations set forth in this Bill of Information; and

    b.    If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a).

The following property is subject to forfeiture on one or more of the grounds stated above:

    a.    A forfeiture money judgment in the amount of at least $322,810.00, or such other amount as determined by the Court, such amount constituting the proceeds of the violations set forth in this bill of information.


DENA J. KING
UNITED STATES ATTORNEY


NICK J. MILLER
ASSISTANT UNITED STATES ATTORNEY

6